**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| ALISHA ARDIS, : Civ. No. | C/A No: <u>3:25-cv-04850-MGL-SVH</u> |
| Plaintiff, : | |
| | RCV'D – USDC COLA SC |
| v. : | JUN 4 '25 PM 2:09 |
| APOTHESOURCE, INC., KRISTA : RAMIREZ IN HER INDIVIDUAL : CAPACITY, AND MICHAEL RAMIREZ : IN HIS INDIVIDUAL CAPACITY : | |
| Defendant. : | : June 4, 2025 |

**COMPLAINT**

Plaintiff Alisha Ardis (hereinafter "Plaintiff") by and through her undersigned counsel Carey & Associates, P.C., brings this action against her former employer(s) Apothesource, Inc. (hereafter "Defendant" or "Apothesource") as well as the individual Defendants, Krista Ramirez and Michael Ramirez in their individual capacities. Plaintiff alleges as follows: **I.**

**PRELIMINARY STATEMENT**

1. Plaintiff's Complaint asserts claims for: (1) discrimination based on sex pursuant to Title VII, 42 U.S.C. § 2000e (hereafter, "Title VII"); (2) discrimination based on sex pursuant to the South Carolina Code Annotated § 1-13-80 (a) (hereafter, "SC Code §1-13-80"); (3) sexual harassment based on quid pro quo pursuant to Title VII; (4) sexual harassment based on quid pro quo pursuant to SC Code §1-13-80; (5) hostile work environment based on sex in violation of Title VII; (6) hostile work environment based on sex in violation of SC Code §1-13-80; (7) discrimination based on disability in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 and 12102, *et seq.*; (8) intentional infliction of emotional distress as against

1

Apothesource; (9) intentional infliction of emotional distress as against Mr. Ramirez in his individual capacity; and (10) intentional infliction of emotional distress as against Ms. Ramirez in her individual capacity.

2. This action is based on the bad faith actions taken by the Defendants to illegally exploit the Plaintiff's sexuality for their own pleasure and to leverage Plaintiffs employment to force her into sexually compromising positions including subjecting her to multiple sexual assaults in the course of her employment. Additionally, the Plaintiff was terminated in substantial part because of her mental health disabilities. Further the Plaintiff's abuse including her termination was part of the hostile sexual environment created by two high-ranking officers and owners of the Defendant Apothesource. The Defendants' efforts to silence the Plaintiff included her unlawful and discriminatory termination.

## II. JURISDICTION, VENUE, & PARTIES

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) based on Plaintiff's claims pursuant to 42 U.S.C. § 2000e and 42 U.S.C. § 12101 and 12102, *et seq*. This Court has supplemental jurisdiction over Plaintiff's remaining claims, including those under the SC Code §1-13-80, et seq. and common law claims, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

4. Plaintiff is and was at all relevant times a resident of the State of South Carolina. The Plaintiff's work for the Defendant was performed at various locations as she often worked remotely or at Defendant's homes for the Defendant, a South Carolina based company. 5. Defendant Apothesource is a health care technology company located and headquartered in South Carolina.

6. The acts and omissions relevant to these allegations took place primarily in South

2

Carolina.

## III. PROCEDURAL PREREQUISITES

7. Ms. Ardis filed a dual state and federal charge of discrimination on the basis of sex, sexually hostile work environment, quid pro quo harassment and for retaliation with the United States Equal Employment Opportunity Commission (EEOC) on October 25, 2024, against the Defendant named in this action.

8. On March 7, 2025, the EEOC issued a Notice of Right to Sue for EEOC No. 415-2025-00171. The Notice of Right to Sue is attached hereto as Exhibit "A."

9. All administrative prerequisites to the institution of this action have been satisfied. 10. Although the claims set forth below for violation of the Americans with Disabilities Act ("ADA") 42 USC §12112(a), et seq. were not expressly named in the above referenced EEOC filing, the Court has subject matter jurisdiction over these claims because the ADA claims are reasonably related to the EEOC charges, the conduct complained of falls within the scope of the EEOC investigation, and the Plaintiff has alleged these further incidents of ADA discrimination were carried out in precisely the same manner alleged in the EEOC charge. All of the elements of an ADA violation were described in detail in the Plaintiff's Affidavit dated October 18, 2024 and submitted along with Plaintiff's EEOC charge of discrimination.

## IV. STATEMENT OF FACTS COMMON TO ALL COUNTS OF THE COMPLAINT 11.

The Plaintiff is a female and suffers from a mental health disability which was known to the Defendants.

12. Plaintiff was employed at Defendant corporation Apothesource from February 15, 2020

through January 15, 2024. Upon information and belief, Apothesource is a Delaware-registered corporation with headquarters at 101 Cabin Road, Easley, South Carolina, 29640.

3

13. From before the start of her employment with Apothesource through her last date of termination on January 15, 2024, Plaintiff was sexually harassed, sexually abused, inappropriately sexualized at work, and she suffered a sexually hostile environment at Apothesource. The perpetrators of this hostile sexual environment which included two sexual assaults were Mr. Ramirez, the CEO and one-third owner of Apothesource and his now ex-wife Ms. Ramirez, then Director of Human Resources and one-third owner of Apothesource. 14. The hostile environment Plaintiff experienced was due to the constant and unremitting sexualization she experienced at the hands of Ms. Ramirez and Mr. Ramirez throughout her employment. Even during periods when Mr. Ramirez was not forcing Plaintiff to have sex with him and during periods when Ms. Ramirez was not planning and carrying out sexual assaults through her lover Adam Turner, both Mr. Ramirez and Ms. Ramirez would constantly discuss sex, force Plaintiff to relive her traumatic assaults as a "victim of rape" for their amusement, and made Plaintiff's daily interactions at work sexually traumatizing.

15. Plaintiff had been a Registered Nurse for ten years. At the time she joined Apothesource Plaintiff had been a Registered Nurse for ten years, she had extensive experience in various nursing roles, with a particular focus on mental health and emergency medicine. Most recently, Plaintiff was employed by the South Carolina Department of Mental Health as a Nurse Manager, overseeing child and adolescent acute care at the state psychiatric hospital. Prior to becoming a nurse, Plaintiff served in the Air Force as a Mental Health Technician (E-5) for six years. 16. Plaintiff had taken a career hiatus for a year before being hired by Apothesource. This was a

deliberate decision to achieve better work/life balance while raising her young daughter, especially as both Plaintiff's husband and she were navigating busy careers. Unfortunately, the efforts to avoid burnout came too late, and shortly after Plaintiff's career break began, both her

4

marriage and her husband's business partnership dissolved. These circumstances made Plaintiff vulnerable both financially and emotionally to Defendant's exploitation.

17. In April 2020, Plaintiff and her husband Jimmy Ardis decided to divorce. Around the same time, Plaintiff's friendship with Defendant Ms. Ramirez, an acquaintance she knew, deepened, and Ms. Ramirez invited Plaintiff to consider an employment opportunity with Ms. Ramirez's company, Defendant Apothesource.

18. Plaintiff was introduced to Apothesource by Ms. Ramirez. Plaintiff first met Ms. Ramirez in 2007 through her husband, Jimmy Ardis. Ms. Ramirez and Mr. Ardis worked together briefly, both working part time at Brookstone and attending College of Charleston. Plaintiff, her husband, and Ms. Ramirez socialized a few times outside of work but remained mere acquaintances until they reconnected more than a decade later, after Mr. Ardis and Plaintiff moved back to South Carolina from California.

19. In 2018, Ms. Ramirez reached out to Plaintiff's husband via Facebook after noticing they had returned to South Carolina. During this time, Plaintiff's marriage was deteriorating, adding to the context of the renewed contact with Ms. Ramirez.

20. In April 2019, Plaintiff's husband expressed his desire for a divorce. Ms. Ramirez, who was still a casual friend at that time, became a significant support to Plaintiff during this period of isolation, when Plaintiff was avoiding contact with family and friends due to the impending divorce. This situation allowed Ms. Ramirez to target Plaintiff as an emotionally vulnerable

person she could exploit.

21. To manipulate Plaintiff and to gain her trust, Ms. Ramirez invited Plaintiff to visit her town, treating Plaintiff to a massage and spa treatment, and later, she purchased concert tickets and booked a hotel for she and Plaintiff to enjoy a worry-free evening. Although these gestures

5

were appreciated, the majority of the deepening friendship occurred through daily text messages where Plaintiff and Ms. Ramirez shared personal details about their lives. Ms. Ramirez was constantly pressuring Plaintiff to reveal details of her sex life. This would become an over arching pattern to the relations as Ms. Ramirez would begin to relentlessly sexualize the Plaintiff.

22. It was during these sex-filled exchanges that Ms. Ramirez suggested Plaintiff consider working for Apothesource. Ms. Ramirez was acutely aware of Plaintiff's vulnerabilities, which eventually allowed her to manipulate Plaintiff without her realizing it.

23. On August 22, 2019 at Ms. Ramirez's invitation, Plaintiff traveled to her family home in Summerville South Carolina to meet her husband, Michael, the CEO of Apothesource, for a networking dinner. Ms. Ramirez explained that their jointly owned company was expanding and identified several areas where Plaintiff's background might be beneficial.

24. Ms. Ramirez and Mr. Ramirez revealed that Apothesource was a company that focused on building software within healthcare systems which allowed better access to patient care through the assistance of advanced software and technologies.

25. During this initial visit with Mr. and Ms. Ramirez, Plaintiff had a focused discussion with Mr. Ramirez about their professional goals within the healthcare industry. Although they established a good rapport and shared career stories over dinner, it was ultimately agreed that the only role they were actively seeking to fill, Project Manager, was not a good fit for Plaintiff's

skills.

26. On February 1, 2020, Plaintiff visited the Ramirez family home again at Ms. Ramirez's invitation to discuss work opportunities. She explained that Apothesource was planning to dedicate a team to develop a commercial product known as the "Financial Assistance Management." This was the company's first commercial product - meaning the first and only

6

product that when finished will be sold in the healthcare product marketplace (primarily to hospital systems and pharmacies). All development costs, overhead, etc. for the program comes from Apothesource's general business operations/internal funds. This is opposed to the company's Veterans Administration contracts which at that time comprised 100% of its revenue.

27. Apothesource's main area of business up until this time was developing software  solutions for the Veterans Healthcare Administration with a focus on removing barriers to care,  improving patient access, securing patient info, increasing communication and scheduling  efficiency between both patients and their service providers as well as between service providers, clinicians, etc. within a broader delivery system. A sizable portion of this work has involved writing code and creating platforms that allow different components, nodes, departments, across a myriad of legacy systems integrate with one another, communicate/share information, etc. 28. As a result of this new product focus, Apothesource would need more clinical expertise  on staff and an entirely different approach to managing developer-led software from the bottom  up. As a registered nurse, Plaintiff could provide this experience. Although this was not an  official interview, Mr. Ramirez wanted to see what Plaintiff's experiences could bring to the  table.

29. During this visit, Mr. Ramirez taught Plaintiff about the software development cycle and outlined the key areas where a subject matter expert would be crucial in bringing FAM to

market. They spent the evening discussing the excitement of developing FAM beyond a prototype and the upcoming plans to assemble a dedicated team separate from the company's primary work with the Veterans Healthcare Administration.

30. Mr. Ramirez assured the Plaintiff that there was a place for her in the user-side development of FAM, but he needed some time to ensure he was making the right decision.

7

FAM was and is Mr. and Ms. Ramirez's passion-project, seen as the company moving towards the creative, save-the-world vision of its founding. This was opposed to the security brought by the lucrative but bureaucratic subcontracting work for the VA.

31. As FAM was Apothesource's flagship product, Plaintiff would be the company's first employee whose salary and benefits were not supported/covered by VA contracts. FAM was where all the cool kids wanted to work and Plaintiff would be Product Owner and proud of it.

32. In the meantime, Mr. Ramirez invited Plaintiff to listen in on some meetings and join Slack to get a feel for the company, which she did for about two weeks. Ms. Ramirez then reached out to schedule another visit to shadow Mr. Ramirez during meetings and potentially finalize a plan for Plaintiff's position while also catching up with her socially. This social interaction with Ms. Ramirez included her continued inquiries about and prying into Plaintiff's sexual activities.

33. On February 14, 2020 Plaintiff was invited once again to the Ramirez home for a final job interview for her hiring at Apothesource. Following the tone from the previous visit, Plaintiff understood that Mr. Ramirez, the CEO and founder of Apothesource, was invested in hiring Plaintiff but needed time to finalize his decision. When Plaintiff was asked to return on February 14, 2020, Plaintiff inferred that they would, at a minimum, discuss the status of Mr. Ramirez's

plan to hire her. Plaintiff remained optimistic, sensing that both Mr. Ramirez and Ms. Ramirez were eager to collaborate and likely ready to offer Plaintiff the job.

34. Although Ms. Ramirez's strange obsession with Plaintiff's sex life had continued, Plaintiff thought the job discussions would bring the relationship to a business level. Plaintiff ignored the warning signs that this unusual interest in her sex life represented. 35. Plaintiff understood that Mr. Ramirez held the ultimate power over the decision to hire

8

her, given his role as the primary decision-maker for the company. Ms. Ramirez, who was one third owner of Apothesource, served as the Director of Human Resources and Clinical Expert for FAM. Ms. Ramirez had expressed plans to step down from her daily involvement with FAM after Plaintiff's hire, though she would still require some level of involvement, which she was still considering.

36. During this visit on February 14, 2020, what Plaintiff perceived as an "interview" turned into a situation where Plaintiff was required to have sex with Mr. Ramirez or lose the job opportunity. This encounter occurred at the urging of his wife, Ms. Ramirez, who had pushed for an "open marriage" relationship with her husband. Plaintiff had been under the impression that this visit would solidify her employment status, especially given the optimistic tone of prior discussions and the time Plaintiff had already spent shadowing and assisting Mr. Ramirez during the day. Despite these expectations, the uncertainty about Plaintiff's hiring status persisted throughout the evening.

37. Later that night, as Mr. Ramirez and Ms. Ramirez appeared to be preparing for bed, Ms. Ramirez excused herself, leaving Mr. Ramirez and Plaintiff alone. At this point, Plaintiff's anxiety over whether or not she would get the job began to morph into confusion, as she

wondered if sex was the final step they were waiting for before making a formal offer. It was. 38. As Mr. Ramirez and Plaintiff were in the kitchen, preparing to part ways for the night, he mentioned that Plaintiff, "had an early day's work tomorrow." Confused by the continued ambiguity regarding her employment, Plaintiff directly asked him, "Speaking of work, nothing has been said about the interview and whether or not I am going to be offered a position on the team. What's up with that?" Mr. Ramirez responded by explaining that that was up to the Plaintiff. Mr. Ramirez informed Plaintiff that if she wanted the job he would need to get some

9

"benefits" out of the deal. Mr. Ramirez made some sexually suggestive expressions, raising his eyebrows and smiling in a way that felt coy and mischievous.

39. It is difficult for Plaintiff to recall the exact words Mr. Ramirez used because as soon as he began to pressure her into sex, Plaintiff began to disassociate from the situation. Mr. Ramirez was demanding sex in exchange for the position at Apothesource. Because Plaintiff was in a vulnerable state, and partly due to the sexual "priming" Ms. Ramirez had done through their conversations, Plaintiff complied with Mr. Ramirez's sexual demands. Mr. Ramirez coerced Plaintiff into oral sex and then intercourse that night. At no time did Plaintiff consent to the sex but she did allow it to happen. Plaintiff was paralyzed by fear and the emotional trauma of being pressured into sex for a job she badly needed.

40. In Plaintiff's state of mind at the time, influenced by desperation and a lack of self-worth, Plaintiff believed that complying with what was explicitly expected of me might secure the job offer. Plaintiff went to bed feeling physically ill, but still hopeful that the next day would bring closure regarding the hiring decision, allowing her to prove her value through her unique skills and experience. Plaintiff hoped it would be a one time incident.

41. On February 15, 2020, the day after the incident described above, Plaintiff was offered and accepted the role of Clinical Specialist with Apothesource. Plaintiff was initially grateful for the opportunity; however, she was also met with remarks repeatedly made by both Ms. Ramirez and Mr. Ramirez that she should "wear a mini skirt to her annual review with her boss and human resources." It was appallingly clear that Mr. Ramirez and Ms. Ramirez now felt they had Plaintiff sexually, and therefore could control her as a sex object. In spite of Plaintiff's attempts to break this dynamic, Mr. Ramirez and Ms. Ramirez would insist on sexualizing Plaintiff throughout her employment.

10

42. Despite the sexual coercion Plaintiff experienced leading up to accepting the job offer, Plaintiff rationalized her decision to take the position. At that time, Plaintiff was in a vulnerable state, both emotionally and financially, following the near dissolution of her marriage and career hiatus. The offer from Apothesource appeared to be a lifeline—an opportunity to regain stability for Plaintiff and her daughter. Plaintiff's hope was that by focusing on her work, Plaintiff could establish her professional value independently of the inappropriate circumstances that led to the offer. However, the remarks made by Ms. Ramirez and Mr. Ramirez, along with the underlying tension, made it clear that the dynamics at play were more complicated and troubling than Plaintiff initially realized.

43. Throughout March and April 2020, Plaintiff made weekly visits to the Ramirez home to train and collaborate during the COVID-19 mandated quarantine. During this time, Plaintiff worked closely with Mr. Ramirez in developing her role as Product Owner for FAM. Together, they sketched out a timeline for developing the features required. By this point, Plaintiff's relationship with Mr. Ramirez and Ms. Ramirez had become enmeshed—sharing quarantine

space while working on FAM and navigating the complexities of their personal lives. The situation was further complicated by the fact that Plaintiff and Mr. Ramirez had previously been sexually intimate, and there remained an underlying uncertainty about the expectations moving forward.

44. Although Plaintiff had made it clear and frequently reiterated that that she was opposed to casual sex, trying to distance herself from the sexual situation between the married couple, flirtation and sexual innuendos were consistently present in their interactions. Both Ms. Ramirez and Mr. Ramirez made it clear that Plaintiff was expected to continue to have sexual relations with Mr. Ramirez during this initial period of her employment. Ms. Ramirez's obsession with

11

Plaintiff's sexuality continued and she felt more free to intrude with sexual discussions which Plaintiff told her were unwelcome.

45. Despite Plaintiff's attempts to focus on work and avoid sexual encounters, on two of the ten or so overnight trips Plaintiff was forced to make to the Ramirez home, Plaintiff was coerced into having sex with Mr. Ramirez. This was not something Plaintiff wanted, but rather something she was coerced into by explicit threats to her new position. Ms. Ramirez encouraged and facilitated these encounters with Mr. Ramirez and seemed to get pleasure or thrills from the sexual interactions.

46. While Mr. Ramirez and Ms. Ramirez acted as if Plaintiff's participation in their sex life was voluntary, it was far from it. Plaintiff's participation was driven by a sense of obligation, fear, and the power imbalance between Mr. Ramirez as her employer and Plaintiff as an employee. Mr. Ramirez and Ms. Ramirez made it clear that maintaining a sexual relationship with him was necessary to secure Plaintiff's position and prevent any negative repercussions at work.

The fact that Plaintiff felt compelled to engage in these encounters under these circumstances is what makes this a case of coercion, not consent.

47. After these first several months, the coerced sex encounters with Mr. Ramirez became unbearable. Plaintiff felt she was being raped and sexually abused each and every time he coerced her into sex acts. Finally, on April 30, 2020, during a scheduled work visit to the Ramirez home, Plaintiff informed Mr. Ramirez that she could no longer have sex with him because her husband, Mr. Ardis and she had decided to try to salvage their marriage after a year of separation. Plaintiff had already shared this news with Ms. Ramirez over the phone earlier in the week. Ms. Ramirez advised Plaintiff to talk directly with Mr. Ramirez in person, as she believed he, "wouldn't take it well." When Plaintiff told Mr. Ramirez, he initially suggested that

12

"Jimmy doesn't have to know," if they continued sleeping together. After becoming visibly angry, surprised and upset at the Plaintiff and after crying and storming out of the room in disappointment, he eventually agreed to honor whatever Plaintiff decided. 48. During this conversation, Plaintiff expressed her desire to maintain a strictly professional relationship moving forward. Although Mr. Ramirez agreed to this, he forced Plaintiff to engage in one last coerced act of sex. This occurred despite Plaintiff's earlier statements, and again, was driven by the same coercive dynamics that had characterized our previous encounters. Again, Plaintiff felt raped and assaulted by her boss.

49. On June 5th through 6th of 2020, Plaintiff visited the Ramirez home again to work with Mr. Ramirez. Ms. Ramirez, who usually coordinated Plaintiff's work visits, explained beforehand that she would be out of town supporting a friend in crisis in Colorado, so she would not be present. Prior to this, all Plaintiff's visits had been planned for times when Ms. Ramirez would

be home. Ms. Ramirez suggested Plaintiff bring her daughter so that her kids and Plaintiff's daughter could play together while Mr. Ramirez and Plaintiff caught up on work. 50. However, the visit ended up not being at all about work. Mr. Ramirez was preoccupied and did not seem to want to talk to Plaintiff. Mr. Ramirez withdrew to the bedroom when not engaged with the kids. It soon became clear that the purpose of this visit was for Mr. Ramirez to consider whether he would continue to employ Plaintiff now that she had stopped having sex with him. Plaintiff left that visit feeling confused and insecure, knowing that Mr. Ramirez was upset with Plaintiff for attempting to establish a platonic and professional relationship. Plaintiff no longer had a supportive work environment.

51. While this was the end of the coerced sex demands from Mr. Ramirez, Ms. Ramirez continued to inappropriately sexualize Plaintiff throughout her employment. In spite of

13

Plaintiff's repeated attempts to tell her that she did not want to discuss sexual topics with her Ms. Ramirez persisted in sexualizing situations constantly. On or around June 24, 2020, Plaintiff was scheduled to meet with Mr. Ramirez and Jenna Gaze (Project Manager) at the Apothesource office space in North Charleston for a preplanning meeting related to Plaintiff's duties as Product Owner (PO) for FAM.

52. The meeting was intended to provide Plaintiff with guidance on backlog management and sprint planning. However, after waiting at the office until 7:30 p.m., Plaintiff realized that neither Mr. Ramirez nor Jenna was going to show up. Plaintiff returned to the Ramirez home, where she was staying, and found Ms. Ramirez at home. Ms. Ramirez confided in Plaintiff that Mr. Ramirez and Jenna had started a sexual relationship and were likely at a hotel, "fucking like rabbits," which explained their absence from the meeting. Ms. Ramirez also revealed that their

relationship had become intimate in the past month, and she had been struggling to keep this secret from Plaintiff.

53. Although Plaintiff was concerned about missing the opportunity to receive guidance on her role as PO, Plaintiff was quickly distracted by Ms. Ramirez's revelations about her marriage. Ms. Ramirez also explained that the reason she left town when Plaintiff visited on June 5, 2020 was actually because she needed to take some space due to conflicting feelings about their decision to bring Jenna into their relationship as a sexual partner.

54. On or around July 7, 2020, during a brainstorming and strategizing meeting with Aless Pinciaro, Clinical Specialist/FAM PO and Mr. Ramirez at the Apothesource office, Mr. Ramirez announced that he had an epiphany regarding the direction of the FAM project. He stated that he wanted Aless to take on the role of Product Owner (PO) for FAM, while Plaintiff would shift her focus primarily to "managing the team." Mr. Ramirez also indicated that Plaintiff would use her

14

clinical knowledge to assist Aless in making functional design decisions about the product. Plaintiff's official title was now "Scrum Master," with the understanding that this title and role could evolve as the project progressed.

55. This change in Plaintiff's role was a clear demotion from the PO position she had previously been working in. This position required Plaintiff to perform tasks that Mr. Ramirez had previously described as a "waste of [Plaintiff's] talents." Because this demotion occurred just weeks after Plaintiff had established a boundary regarding the sexual relationship with Mr. Ramirez, Plaintiff knew that this role change was a humiliating reflection of Plaintiff's perceived worth as an employee. The timing made it obvious that this was a direct consequence of Plaintiff's decision to stop engaging in sexual activity with Mr. Ramirez.

56. This demotion would have long term effects on Plaintiff's position with Apothesource. Plaintiff would be demoted a second time because of this initial demotion which led to Plaintiff's termination as her services were not really needed in the new position. Plaintiff was devastated at the humiliation of the demotion based on her unwillingness to have sex with Mr. Ramirez. Plaintiff kept these thoughts to herself though, and outwardly expressed enthusiasm and willingness to contribute to the team in her new role, despite the personal devastation she was experiencing.

57. From July through October 2020, Mr. Ramirez stopped demanding sexual services from Plaintiff as he had a new worker to provide sexual favors for him, Jenna Gaze. During this July to October 2020 period, Ms. Ramirez continued to expose Plaintiff to unwanted sexual talk, descriptions of her open marriage activities as well as Mr. Ramirez's and continued probing of Plaintiff's sexual behavior with her husband. During this period, Plaintiff began the process of setting up the team with Aless, meaning she was responsible for forming and organizing the team

15

while training Aless on what Plaintiff had learned from Mr. Ramirez and through her own independent study of Scrum methodology and software development. This involved mentoring Aless and guiding the team as they transitioned into their new respective roles. 58. In November of 2020 Plaintiff had a one-on-one meeting with Mr. Ramirez to re establish work expectations and discuss progress. During this meeting, Mr. Ramirez expressed satisfaction with Plaintiff's work and apologized for being so absent due to his constant sexual escapades with Jenna. Plaintiff did not want to hear this but Mr. Ramirez insisted on sharing sexual details as did Ms. Ramirez when they met. Plaintiff and Mr. Ramirez also discussed his vision for the Financial Assistance Management (FAM) product and Plaintiff's anticipated role in

public-facing operations once the product went to market.

59. Additionally, at this November 2020 meeting, Mr. Ramirez asked Plaintiff to prioritize "being available" for Ms. Ramirez during a difficult period she was going through, and to coordinate with her when her input was needed on the FAM project. Mr. Ramirez said this was a special assignment and that Plaintiff had to "be there for Ms. Ramirez" as part of her job responsibilities and because their marital relations had become strained. Mr. Ramirez made it clear that Plaintiff had to participate in Ms. Ramirez's sexual discussions as part of her job requirements. Mr. Ramirez also said this directly.

60. Ms. Ramirez continued to make unwanted and explicit sexual references to Plaintiff including revealing that Jenna and Mr. Ramirez and Ms. Ramirez had all had a threesome together recently.

61. Plaintiff began her new role which included being Ms. Ramirez's sexual confidant and reporting to Mr. Ramirez on Ms. Ramirez's moods and mental state, Mr. Ramirez would promote his new girlfriend Jenna Gaze which would cause Plaintiff further demotion. In January

16

to March of 2021 Mr. Ramirez installed Jenna Gaze as a part-time Project Manager (PM) on the FAM project, which created tensions due to overlapping responsibilities and confusion about their respective roles. With support from Seth Gainey, the lead senior developer on Plaintiff's team, it was eventually clarified that Jenna's primary role was to relay information to Mr. Ramirez when he was unavailable, and that she did not have an actionable role on the team. 62. In March 2021, Beth Strutton was hired as a clinical specialist for FAM, it was explained that her role could be to be a backup PO when Aless was on leave. Nobody on the team, including Beth, understood what was expected of her as a primary role. The additions of Jenna and Beth

made Plaintiff's work on the all important FAM team irrelevant or redundant. This was further retaliation for Plaintiff's refusal to participate in sex with Mr. Ramirez and for her resistance to listening to sexual talk from Ms. Ramirez. Plaintiff was trying to accept her demotion and keep her interactions with Mr. Ramirez and Jenna professional, but they would not allow Plaintiff to escape their web of open and licentious sex.

63. On March 6, 2021, Plaintiff was deliberately excluded from a critical resource allocation meeting, despite having been central to the strategizing conversations that led to its scheduling. The meeting agenda was to discuss the allocation of Full-Time Equivalents (FTEs) for upcoming work on FAM, an issue Plaintiff had identified and driven as Scrum Master. The need for this meeting arose from the challenges Plaintiff had repeatedly brought to Mr. Ramirez's attention regarding the unpredictability of developers being pulled between commercial and VA projects, depending on contract demands.

64. Prior to this meeting, Plaintiff had struggled to implement Mr. Ramirez's suggestion to meet with him and Jenna each sprint cycle to review developer bandwidth. Plaintiff's efforts to address these issues over several months had not gained traction, and her exclusion from this

17

meeting—attended by Michael, Ryan, Jenna, Aless, Craig, and Seth—left Plaintiff sidelined from discussions directly related to her role and responsibilities. Plaintiff texted Mr. Ramirez expressing concern for why she wasn't included and received a response that for now, "it's limited audience." This was a clear sign that the inclusion of Jenna and Beth meant Plaintiff was being sidelined even more than when she was first demoted.

65. While Plaintiff was not coerced into any further sexual encounters with Mr. Ramirez, he felt free to discuss Plaintiff's body or make comments about Plaintiff's appearance as if he were

Turner join the two women at Ms. Ramirez's house for one of the Plaintiff's required overnight stays in Ms. Ramirez's new apartment. After Adam arrived that evening, Ms. Ramirez and Plaintiff were settling into bed when Mr. Turner lingered around, talking to Ms. Ramirez as both women fell asleep. Plaintiff was startled awake when Mr. Turner began groping her in her sleep, reaching his hands under Plaintiff's shorts and underwear. Plaintiff attempted to move to another room to sleep, but Mr. Turner followed and continued his advances. Plaintiff felt violated and guilty for not taking precautions about an unfamiliar man being in the room, which led to Plaintiff's vulnerability. Plaintiff felt that Ms. Ramirez's constant attempts to include her in her sex life should have been a warning that Mr. Turner was not there that evening by coincidence. This was a sexual ambush planned with M.s Ramirez. 72. Plaintiff immediately confided in Ms. Ramirez about the violent sexual assault from Mr. Turner, expressing her discomfort and asking that Mr. Turner not be present when Plaintiff visited in the future. Ms. Ramirez appeared remorseful and concerned about Mr. Turner's character, openly admitting that the situation gave off "perp vibes" and Ms. Ramirez admitted that she knew that Mr. Turner was not a healthy person to have in her life. Ms. Ramirez also admitted to Plaintiff that Mr. Turner "must have gotten the wrong idea" from her because she was always "sexualizing" Plaintiff to Mr. Turner.

20

73. Plaintiff was shocked and felt betrayed by this admission that Ms. Ramirez had, in effect, facilitated Plaintiff's rape. Ms. Ramirez admitted that she had sexualized Plaintiff to Mr. Turner before his visit through her descriptions of Plaintiff. The Plaintiff did not report the assault to the police at the time, as she was in shock and unsure of how to process what had happened and she feared repercussions from Ms. Ramirez and Mr. Ramirez if she reported. Plaintiff didn't discuss

this with anyone else out of fear of retaliation. When Plaintiff had set a sexual boundary with Mr. Ramirez, she was immediately demoted. Plaintiff felt sure if she set a boundary with Ms. Ramirez she would be fired.

74. While Ms. Ramirez seemed sympathetic on one level, Plaintiff also got the distinct impression she was somehow disappointed that Plaintiff did not engage in sex with Mr. Turner. This assault was right on the heels of numerous insistent invitations from Ms. Ramirez to the Plaintiff to engage in polyamorous encounters with Ms. Ramirez's lovers. Plaintiff felt that Ms. Ramirez's constant interest in her sex life and in looping Plaintiff into her and Mr. Ramirez's sex lives gave Ms. Ramirez some sort of thrill or pleasure.

75. Plaintiff hoped Ms. Ramirez would not expose her to Mr. Turner again and she tried to forget about what happened. Mr. Ramirez continued to instruct Plaintiff that she was to stay personally close to Ms. Ramirez as part of her job. Plaintiff was tasked by Mr. Ramirez to ensure Ms. Ramirez's involvement in the FAM project during crucial moments and to "be there for her" at all times. This dependency meant Plaintiff had to navigate Ms. Ramirez's personal life, including her relationships, which directly put Plaintiff in situations where she was sexually assaulted by one of Ms. Ramirez's partners.

76. On July 18, 2021 Plaintiff received an in-person performance review with Mr. Ramirez. At one point previously Ms. Ramirez and Mr. Ramirez joked that Plaintiff should wear a short

21

skirt to her annual review, which led Plaintiff to believe she was always being evaluated sexually. This review was no different. Just weeks after Plaintiff had complained to Ms. Ramirez about being sexually assaulted by her boyfriend Mr. Turner, Plaintiff was informed by Mr. Ramirez that she would be moved off the FAM project to focus on work with the Veterans

Affairs (VA) side of the company. Mr. Ramirez explained that the FAM project was not busy enough to require a dedicated Scrum Master and added, "I know how this looks, believe me, but I swear that this has nothing to do with Jenna."

77. Mr. Ramirez was referring to his prior decision to promote Jenna to the FAM team following Plaintiff's refusal to continue sexual relations with him. Mr. Ramirez had created a situation where Plaintiff would quickly become redundant as she was replaced by his new girlfriend Jenna and that had finally come to pass. This was another demotion in direct retaliation for Plaintiff's report of rape by Mr. Turner to Ms. Ramirez two months prior to this. Mr. Ramirez's comment was a clear indication that it had everything to do with Jenna and her replacement of Plaintiff as both Mr. Ramirez's paramour and as team leader for the FAM project.

78. Plaintiff was devastated by this decision. Not only was this clearly related to Plaintiff's continued refusal to engage Mr. Ramirez and Ms. Ramirez in sexual relations, either directly or vicariously through Mr. Turner, but Plaintiff had invested significant time and passion into the FAM project. Despite the fact that this was a demotion and a reflection of Plaintiff's decreased value as an employee, she did not complain. Plaintiff was focused on proving her worth to the company and was also heavily involved in preparing for FAM's first product increment planning session, a significant milestone that was scheduled for that same week. Plaintiff was desperate to keep her job in spite of the constant sexual exploitation of Mr. Ramirez and Ms. Ramirez.

22

79. Throughout the remainder of 2021 and through early 2022, Mr. Ramirez and Ms. Ramirez continued to expose Plaintiff to sexual comments, discussions of their sex lives, and exposure to unwanted sexual conversations. Mr. Ramirez continued to require Plaintiff to be a companion to Ms. Ramirez to facilitate her involvement with Apothesource without him having

to engage with her that often. Mr. Ramirez required that Plaintiff continue to discuss Ms. Ramirez's sex life as she "loved to confide in" Plaintiff as a, "girlfriend."

80. Ms. Ramirez continued to expose Plaintiff to unwanted sexual conversations and detailed and repulsive descriptions of her sexual activities with multiple partners including Mr. Turner throughout late 2021 through early 2022. Ms. Ramirez seemed oblivious to the fact that Plaintiff was traumatized by these discussions concerning her and Mr. Turner's sex life as she continued to see him after he assaulted the Plaintiff. This exposure to the unwanted details of Ms. Ramirez's sex life was made part of Plaintiff's regular job duties by Mr. Ramirez who still treated Plaintiff as a sex object.

81. On May 14, 2022, almost exactly one year since the previous assault, Plaintiff was raped and forcibly penetrated by Mr. Turner during one of her mandatory stays at Ms. Ramirez's apartment. When Mr. Turner showed up that evening Plaintiff was scared but Ms. Ramirez assured me nothing would happen with Mr. Turner.

82. Plaintiff finds it difficult to explain why she stayed in that apartment that night with the man who had groped and assaulted her the year before. Ms. Ramirez was forcefully insisting that Plaintiff stay when she suggested that she should leave. Because Ms. Ramirez and Mr. Ramirez controlled every aspect of Plaintiff's work life and held her job in their hands Plaintiff felt that she had no choice but to stay. Staying with Ms. Ramirez and being "there for her personally" was a job requirement according to Mr. Ramirez. Plaintiff was also convinced that Ms. Ramirez

would shield Plaintiff from further assault as she now knew Mr. Turner's behavior with Plaintiff the year before.

83. That evening when Plaintiff went to go to bed in the guest bedroom, Mr. Turner lingered

around the door as she transitioned, hovering and making small talk while Ms. Ramirez was in

the shower. When Plaintiff announced she was officially going to bed she said goodnight and

went to the spare room and closed the door. While Plaintiff laid in the bed texting her husband

Mr. Turner came into the room twice, once to ask Plaintiff what she was doing and once to ask

her if she wanted something to eat. Mr. Turner's lack of boundaries was concerning given his

prior assault but after asserting to him that she was going to sleep and asking him not to return to

the room he seemed apologetic and cooperative and did not return again while Plaintiff was

awake.

84. Plaintiff awoke however, hours later, to Mr. Turner straddling her sitting on her back as she

lay on her stomach awakening from deep sleep, with Mr. Turner's fingers already inside the

Plaintiff and her shorts and underwear removed. As Plaintiff came to and realized what was

going on she was terrified, she turned over with Mr. Turner half on top of her and confused.

Plaintiff asked Mr. Turner why he was doing this, and told him she didn't want this. Mr. Turner

proceeded to take off his shorts as if he didn't hear the Plaintiff or see her fear, or feel her

resistance pushing him away. Mr. Turner stared blankly at the Plaintiff and whispered mumbling

words and groaned pleasurably and attempted to climb back on top of her. It was then that

Plaintiff shouted at Mr. Turner to get off of her and stop, and he did, saying, "Okay, okay, okay,

I'm going!" as he pulled his shorts back on and left.

85. This incident left Plaintiff completely traumatized. Plaintiff had let her guard down about

not wanting to see Mr. Turner because of the constant pressure to remain "close" with Ms.

Ramirez as Mr. Ramirez insisted she do as part of her job. Because Ms. Ramirez had insisted

that Mr. Turner was "a good guy" Plaintiff thought that if she maintained self-protective

boundaries he was not a threat. After the assault at around 7am Plaintiff had the chance to check the time, she waited a few minutes in the room hoping it was enough time that Mr. Turner wouldn't be in the common area of the apartment before Plaintiff made a swift exit to go home. Plaintiff drove the two hours home directly, urgently seeking the safety of her husband. When Plaintiff got home she was hysterical, and Plaintiff disclosed the details of the assault including the incident from the previous year.

86. After the assault, Plaintiff continued to perform her job duties, but the trauma from the incidents significantly affected Plaintiff's sense of safety and security. Plaintiff was emotionally devastated suffering from severe depression, suicidal thoughts and anxiety. Plaintiff was unable to sleep and kept reliving the trauma of the two assaults by Mr. Turner. Plaintiff's work attendance and performance began to suffer. Plaintiff became obsessively concerned with telling Ms. Ramirez about what happened, fixating on how terrible this was going to be for her instead of thinking about what it was doing to the Plaintiff. Plaintiff froze up and became paralyzed in fear when she would go to have a work meeting with Mr. Ramirez that week, feeling like all around her were reminders that were triggering memories of the rape.

87. Plaintiff told Ms. Ramirez about the rape on June 5, 2022 after talking extensively with Plaintiff's therapist about it, preparing to be grounded in her own needs and prepared to be a boundaried positive friend to Ms. Ramirez. When Plaintiff told Ms. Ramirez she was shocked, and momentarily started to explain that she "thought she heard you doing something" but that Mr. Turner told her it was consensual. When Plaintiff explained to her the terror she experienced at waking up to Mr. Turner with his fingers inside her when she had asked him to stay out of her

25

room she said she understood, she believed the Plaintiff, and "this is not okay, we're going to be

okay" and that she was breaking up with Mr. Turner. Ms. Ramirez apologized for what happened to Plaintiff, and reassured her that Mr. Turner was not going to be in her life anymore. 88. Throughout this period after the second assault between May and October of 2022, Ms. Ramirez continued to expose Plaintiff to sexually explicit conversations about her lovers which became traumatizing every time Plaintiff heard them as she associated Ms. Ramirez's sex life with the assaults by Mr. Turner. Ms. Ramirez took Plaintiff on a trip to Colorado in September, 2022 as a gift to heal with her around the assault. Plaintiff didn't want to go on the trip and it caused a lot of fighting with Plaintiff's husband-but Ms. Ramirez was so persistent and Plaintiff felt backed into a corner needing to go and try to make things better for her job. The trip was to see a band at Redrocks and stay at a nice Air B&B and get massage services, it was eerily structured to mirror a date Plaintiff had with her ex affair partner which Ms. Ramirez knew about and took many liberties of bringing things about him into the fold when Plaintiff hung out, seemingly trying to create chaos and stir up unhealed wounds between Plaintiff's husband and the Plaintiff.

89. Plaintiff was a wreck the entire trip, she felt unsafe with Ms. Ramirez and she didn't know exactly why at the time. Plaintiff thought at the time that Ms. Ramirez cared about her and couldn't figure out why being around her made Plaintiff feel unsafe. Ms. Ramirez invited one of her lovers that lived in Colorado to come visit her to have sex while she and Plaintiff were there, and she invited Plaintiff to meet him but Plaintiff stayed in her bedroom on the bottom floor of the house for the entire night and next morning until the man left. This trip felt like Plaintiff was being trapped again sexually and she felt helpless to get away. Uncharacteristically in

comparison to all of the other gifts Ms. Ramirez freely gave the Plaintiff, for this trip Ms.

Ramirez asked Plaintiff to not tell Mr. Ramirez she paid for Plaintiff's trip. 90. During Plaintiff's annual one-on-one meeting with Mr. Ramirez in October of 2022, Plaintiff also had dinner with him and Jenna afterward. Plaintiff knew that her work performance was lacking in the months that followed the rape in May of 2022, and she was especially aware when she would become panicked and tearful preparing to join routine meetings where it was just Mr. Ramirez and the Plaintiff. It was typical to start the work calls between Plaintiff and Mr. Ramirez with brief small talk and asking about each other's families. Plaintiff felt absolutely paralyzed trying to figure out what she could say about how she was doing or if Ms. Ramirez's name were to come up. Plaintiff realized that if she was having that much trouble going to meetings then she needed to let her boss know about her work related trauma. 91. Plaintiff felt like the sexual abuse she had suffered at Apothesource was overwhelming at this point and that Mr. Ramirez should know. Plaintiff needed help but she did not want to lose her job. Mr. Ramirez had told Plaintiff previously that it was part of her job to remain very close to Ms. Ramirez. Plaintiff felt she had no one else at Apothesource to turn to. 92. With Mr. Turner being a presence in Mr. Ramirez's family life, Plaintiff also felt obligated to inform him of Mr. Turner being a risk, which was complicated because Plaintiff was pretty sure Ms. Ramirez would feel humiliated to have her ex-husband know that her boyfriend was a dangerous predator. Plaintiff told Mr. Ramirez that she was assaulted twice by Mr. Turner. Mr. Ramirez assured Plaintiff of complete confidence and they both agreed that Plaintiff would let Ms. Ramirez know that she told him about it when the time was right. Mr. Ramirez did not want Plaintiff to tell her right away because he knew she would be embarrassed and feel under scrutiny if Mr. Ramirez was to know their son had interactions with a predator.

27

93. During this conversation Mr. Ramirez apparently felt culpable in what had happened to Plaintiff. Mr. Ramirez admitted that he felt that he had taken advantage of Plaintiff as Mr. Turner had when he coerced her into sex at the start of her employment. Mr. Ramirez seemed concerned that Plaintiff viewed him as she did Mr. Turner, as a dangerous predator. Plaintiff told Mr. Ramirez that the sex with him was coerced but was not forcible rape as Plaintiff eventually "allowed" the sex to happen with Mr. Ramirez. What Mr. Ramirez did was a forced physical intrusion unlike anything Plaintiff had ever experienced in her life. Mr. Ramirez was emotionally supportive, and reassuring about her job being secure, encouraging Plaintiff to prioritize her own healing over work and not to hesitate to take days off as needed to cope with the sexual trauma Plaintiff was experiencing.

94. Mr. Ramirez seemed overly intrusive about Plaintiff's healing process after she disclosed the assaults by Mr. Turner to him in late 2022. Mr. Ramirez made it clear that Plaintiff needed to confide in his new girlfriend (Plaintiff's co-worker) Jenna because she was a rape survivor also. Mr. Ramirez said Plaintiff's job was secure as long as she leaned on Jenna for support as a fellow survivor. This demand was couched as paternalistic concern for Plaintiff's healing process but was instead a bizarre and further intrusion into Plaintiff's sex life. Plaintiff was now required to confide in her former abuser's girlfriend about her rape by her abuser's ex-wife's boyfriend.

95. Throughout 2022 and through 2023, Mr. Ramirez would check up and make sure Plaintiff was "working with Jenna" on her rape issues. This was an outrageous and shocking thing to require of Plaintiff as part of her job, much like being Ms. Ramirez's sexual confidant. This type of involvement in Plaintiff's sexual trauma by her employer and former abuser created further trauma for Plaintiff as she was forced to relive her traumatic assault with Jenna to satisfy Mr. Ramirez's twisted interest in Plaintiff's recovery. Mr. Ramirez viewed this as "making

28

amends" for what he did to Plaintiff by coercing her into sex for her position, but instead it

further traumatized the Plaintiff.

96. In January of 2023, Mr. Ramirez discovered that Ms. Ramirez was back with Mr. Turner.

Plaintiff felt shocked and betrayed that Ms. Ramirez would return to Mr. Turner after he

assaulted the Plaintiff twice while Ms. Ramirez was present in the apartment. Plaintiff confronted

Ms. Ramirez about it and informed her that Mr. Ramirez knows about it. 97. Plaintiff confronted

Ms. Ramirez about seeing Mr. Turner because it was now unsafe again for Plaintiff to be at Ms.

Ramirez's house where she was often required to be in order to  maintain her job duties as Ms.

Ramirez's confidant and companion per Mr. Ramirez's orders. 98. Ms. Ramirez said she was

devastated and humiliated and begged Plaintiff "not to give up  on her as a friend." This was

strange because being her "friend" was a required duty that she and  Mr. Ramirez pressured

Plaintiff into to begin with. Ms. Ramirez immediately turned the situation  into a sexual

manipulation. Ms. Ramirez claimed that she was abused by Mr. Turner as well and  that she

needed help. Plaintiff's husband and the Plaintiff ended up helping her by offering  support and

safety when she told Mr. Turner again that their relationship was over. Ms. Ramirez said she

feared that Mr. Turner might come to her house and stalk her, she also felt unsafe to be  alone and

was suicidal in the days after Plaintiff confronted her. Ms. Ramirez texted Plaintiff suicidal

threats later that night attempting to guilt the Plaintiff to drive back up to her house and  stay with

her. This was a further attempt to draw Plaintiff into her sexual situations. 99. During 2023, Ms.

Ramirez continued to sexualize Plaintiff and to involve her in her  bizarre sex obsessions in every

way she could. At this time, Ms. Ramirez had stepped away from  day to day operations of

Apothesource, but Mr. Ramirez still told Plaintiff Ms. Ramirez was an  "owner" and that her

word was "law" at the company. Further, Mr. Ramirez made it clear that

Plaintiff's continued "friendship" with Ms. Ramirez was required to maintain her employment

with the Company.

100. Ms. Ramirez began to coerce Plaintiff into working with her on a sex-based business

project that had nothing to do with Apothesource's business or Plaintiff's job duties. However,

since Mr. Ramirez was requiring Plaintiff to, "support Ms. Ramirez in all of her endeavors" as

part of her job at Apothesource, the duty to participate in this unusual sex project fell on Plaintiff

also. This was part of Ms. Ramirez's weird desire to draw Plaintiff into sexual situations and to

make Plaintiff support her sexual lifestyle as part of my job at Apothesource. 101. Ms. Ramirez

told Plaintiff that the project she had to help her with was something she and Mr. Ramirez had

conceived while they were still together. The project was to develop a software product aimed

at providing a safety resource to sex workers. The idea was to create an underground network

where sex workers could give reviews on unsafe clients, without compromising their work

going to police due to illegal sex work practices. The software would also aim to provide a

forum to share information on pro-sex professional services like pro-sex therapists and doctors.

102. Ms. Ramirez said this was yet another non-profit project that Mr. Ramirez never had time

for due to the demands of Apothesource. Ms. Ramirez engaged Plaintiff to start up the project

with her and one of her new lovers, "Ricardo" who worked in software, and a local sex worker in

Charleston, South Carolina that Ms. Ramirez and Mr. Ramirez had procured sexual services

from in the past. Although Plaintiff did not want to participate in the project, she was required to

by Mr. Ramirez and Ms. Ramirez who was still in control of Plaintiff's employment through Mr.

Ramirez who told Plaintiff Ms. Ramirez's word at Apothesource was still "law."

30

103. Ms. Ramirez attempted to lead Ricardo and Plaintiff and the sex-worker as a professional scrum team, with the help of Plaintiff's coaching her about scrum management. Ms. Ramirez updated Plaintiff on this as something Plaintiff had to spend time on over a period of a couple of months, and eventually the project work fell off because the female sex worker had some sort of problem with Ms. Ramirez and/or Ricardo.

104. During 2023 Mr. Ramirez's intrusive insistence that Plaintiff confide in his girlfriend Jenna Gaze about her rape continued to re-traumatize the Plaintiff.

105. In March 2023, Apothesource held a company retreat. Jenna Gaze made extra efforts to raise the issue of Plaintiff's rape as she often did and said she needed to "look out for [Plaintiff] on the trip." This was an example of the myriad ways Mr. Ramirez and Jenna found to make Plaintiff relive her rape by Mr. Turner because they got some twisted excitement from it. 106. During this time Plaintiff's work continued to be affected by the trauma of her rape which was facilitated by Ms. Ramirez and the re-traumatizing conduct of Mr. Ramirez the CEO and her boss at Apothesource. In early to mid 2023 Plaintiff asked Jenna Gaze what perception HR or anyone else at the Company had about the extra PTO time Plaintiff had been taking over the recent months due to the sexual trauma she was continuously experiencing at Apothesource. Plaintiff learned that HR had been instructed by Mr. Ramirez to grant Plaintiff liberal PTO "with no questions asked." The company did not have a policy on PTO limits, and Mr. Ramirez and Jenna were well aware Plaintiff was taking frequent mental health days and encouraged Plaintiff to take time to heal as needed. In the months prior to the retreat Plaintiff had been attending extra therapy and sometimes took entire days to just reset after being triggered, at the advice of Mr.

Ramirez and Jenna. Plaintiff had hoped the retreat would help her feel less isolated and connect

31

with others about work, and maybe find some inspiration about work that didn't involve reliving

traumatic sexual memories.

107. On September 13, 2023, Jenna would continue her constant intrusion into Plaintiff's sexual

trauma once again. Plaintiff received a text message from Jenna, where she reflected on her

observations of Plaintiff's behavior during a recent company event. Jenna noted that Plaintiff was

in a state of hyper-focus, particularly in crowded areas, and that she was constantly scanning her

surroundings for potential threats. Jenna observed that Plaintiff appeared to be "clocking every

room and place we went," looking at everyone as either a threat or a potential threat. 108. Jenna

also mentioned that this hyper-vigilant behavior is often a symptom of trauma, specifically

relating to post-traumatic stress disorder (PTSD). Jenna shared that this was the first time she

hadn't "clocked a room" since her own rape, emphasizing that she recognized similar trauma

responses in the Plaintiff. Jenna's observations, while insightful seemed more intended to engage

Plaintiff yet again about her rape and to feed off of Plaintiff's symptoms and report them to Mr.

Ramirez. It was as if Mr. Ramirez wanted to therapize Plaintiff through Jenna once again for

some sort of thrill or for exoneration for his own sexual coercion of the Plaintiff. 109. The

constant sexual trauma therapizing in which Plaintiff was required to engage with Jenna Gaze

pursuant to Mr. Ramirez's orders was based on Mr. Ramirez's understanding that Plaintiff

suffered from one or more mental health disabilities including PTSD, major depressive disorder,

and general anxiety disorder. These disorders were related to the sexual trauma the Plaintiff

suffered at Apothesource.

110. Mr. Ramirez permitted Plaintiff to take unlimited PTO time as a reasonable accommodation of these disabilities to recover from and to treat for these mental health disabilities.

111. In late 2023 and early 2024, Mr. Ramirez came to believe that the Plaintiff's mental  health disabilities were interfering with her work production. This prompted Mr. Ramirez to plan  to terminate the Plaintiff based on her disabilities.

112. Although the Plaintiff was performing all of her essential job functions competently with the reasonable accommodation of increased PTO time, Mr. Ramirez decided that Apothesource did not wish to continue providing that accommodation and so the Plaintiff was terminated in substantial part because of her disabilities.

113. On October 12, 2023 Plaintiff traveled to Charleston, South Carolina to participate in a marketing initiative aimed at highlighting Apothesource veterans on the company's website. Volunteering for this initiative was an extremely personal decision and out of character for Plaintiff, as she typically declined such opportunities since her repeated sexual assaults. However, Plaintiff chose to participate as a gesture of good faith towards a company in which Plaintiff had invested so much of herself even though the events of the previous three years had left Plaintiff feeling devalued as an employee and humiliated and degraded as a human being.

114. The goal of the photo shoot was to enhance the company's appeal in securing contracts within the veteran space. As there were only a few veterans employed at Apothesource, and given that Mr. Ramirez had previously emphasized Plaintiff's veteran status as a significant asset to the company's work, Plaintiff willingly participated in the initiative. The photos from this shoot were prominently featured on social media and the company website for Veteran's Day.

These images remained on the website until the day Plaintiff was informed of her termination, at which point they were removed.

115. Toward the end of 2023 Apothesource was awarded its largest contract to date, in part due to Plaintiff's efforts. Around this same time, Plaintiff felt a strange shift in her relationship

with Mr. Ramirez, Jenna, and Ms. Ramirez. All three of them seemed to be drawing away from Plaintiff in that they communicated with her less and intruded into Plaintiff's life much less. During this October through December 2023 period, Plaintiff finally felt as if the three abusers were leaving her alone and they seemed to reduce the frequency of the sexual trauma they had inflicted on Plaintiff so regularly from 2021 through 2023.

116. While the sexualization of Plaintiff by Jenna, Mr. Ramirez, and Ms. Ramirez continued in small ways into January of 2024, Plaintiff began to feel like the worst of the sex abuse and re traumatizing from her three tormentors was finally starting to subside. It was as if all three of them began to be tired of abusing Plaintiff, intruding into her sexual trauma, and involving her in unwanted sexual discussions as Ms. Ramirez had always done.

117. As it turned out, Mr. Ramirez, Jenna, and Ms. Ramirez were indeed tired of Plaintiff.  What Plaintiff thought was a humane reprieve from the constant sexualization she had endured  and a prospect of finally working without the shadow of sex over-hanging her professional interactions, was in fact the end of Plaintiff's employment. On January 16, 2024, Plaintiff was informed that she was being terminated. The removal of Plaintiff's images from the company website on the same day felt like a final, symbolic act that reinforced Plaintiff's feelings of being devalued by the company, despite her contributions and willingness to support their initiatives. Plaintiff received an apology note from the company in the mail the following week. 118.

Although there were new projects that required Plaintiff's attention such as the "Annie Project" and "VA.gov test automation" and the fact that Apothesource had received its biggest contract at end of 2023, Plaintiff was being terminated without legitimate cause. The clear reason was that Plaintiff's employers, Ms. Ramirez and Mr. Ramirez had tired of sexually abusing and exploiting the Plaintiff for their own amusement.

34

119. After Plaintiff was let go, at the January 2024 company all hands meeting Mr. Ramirez and Jenna announced the news that the company had secured a contract alliance under Iron Bow for a very lucrative and long pursued number of projects that supported technology in the VA Office of Connected Care. This was cause for celebration and the employees were told they have these funds locked in for the next five years of work. Mr. Ramirez mentioned several projects during this meeting that Plaintiff had assisted him with over 2022-2023.

120. In spite of the fact that the company had ample work and that much of the success was due in part to the Plaintiff's work, she was terminated because of her sex in that Mr. Ramirez had tired of using and exploiting the Plaintiff's sexuality for the amusement of his ex-wife and his girlfriend.

121. Because the sexualization of the Plaintiff by Defendants took place on a regular basis from prior to the start of Plaintiff's employment in February 2020 through her termination in January 2024, the sexual harassment complained of was part of a continuing course of conduct in which the Defendants engaged throughout Plaintiff's tenure.

122. Because the Defendants made it part of Plaintiff's job requirements to submit to sexualization at work throughout her period of employment, the conduct of the Defendants constituted a policy, pattern, and practice of the Defendants which was imposed as a condition of

Plaintiff's employment at Apothesource.

## IV. CAUSES OF ACTION

### COUNT ONE

### DISCRIMINATION BASED ON SEX

### IN VIOLATION OF TITLE VII

35

123. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 122 above, as though fully set forth herein.

124. Plaintiff was discriminated against based on her sex in that she was subjected to disparate treatment and was terminated based on her gender as a female.  125. As a female, the Plaintiff was a member of a protected class.  126. Plaintiff was otherwise highly qualified for her position and she had been an  exemplary employee of the Defendant.

127. Plaintiff suffered adverse employment actions based on her sex as set forth above in  that the Defendant: (1) treated female employee such as herself as sex objects; (2) stripped  Plaintiff of duties and assignments when she refused to continue to perform sexually for the  Defendant CEO Mr. Ramirez; (3) required Plaintiff as a female rape victim to disclose her  trauma to other female employees like Jenna Gaze; and (4) terminated Plaintiff in favor of  similarly situated male employees who were equally or less qualified and experienced than the  Plaintiff.

128. Plaintiff further suffered the adverse employment actions of termination and  demotion in exchange for exemplary performance as compared to her similarly situated male comparators.

129. All of the adverse employment actions set forth above took place under

circumstances that give rise to an inference of sex discrimination.

130. Because Defendant, acting by and through its most senior executive, Mr. Ramirez, expressed directly to the Plaintiff that his biased view was that female employees were better to work with because Mr. Ramirez liked to sexualize them directly reveals the discriminatory animus behind Mr. Ramirez's conduct towards Plaintiff.

36

131. The Defendant cannot provide a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The proffered reason for termination that the Plaintiff was performing poorly is unsupportable by any facts. No disciplinary records, performance improvement plans, or counseling sessions preceded the Plaintiff's sudden pretextual termination.

132. Plaintiff can successfully demonstrate that there is no factual basis for any alleged claim of poor performance and any rationale given by Defendant for Plaintiff's termination is a mere pretext for discrimination and the clearly expressed sexual bias of Mr. Ramirez. 133. Defendant has unlawfully and willfully discriminated against the Plaintiff substantially because of her sex with regard to the terms, conditions, opportunities and privileges of her employment in violation of Title VII.

134. The Defendant's adverse employment actions against the Plaintiff as set forth above, occurred under circumstances giving rise to an inference of sex discrimination. 135. As a result of the Defendant's unlawful conduct as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and benefits and severe impairment to her career and future career opportunities and earnings capacity. 136. Plaintiff is entitled to compensation for lost wages including front and back pay, punitive damages, emotional distress damages, and attorney's fees and costs as a result of the Defendant's discriminatory actions based on her sex.

## COUNT TWO

## DISCRIMINATION BASED ON SEX IN VIOLATION OF SC CODE §1-13-80

137. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 136 above, as though fully set forth herein.

37

138. Plaintiff was discriminated against based on her sex in that she was subjected to disparate treatment and was terminated based on her gender as a female.  139. As a female, the Plaintiff was a member of a protected class.  140. Plaintiff was otherwise highly qualified for her position and she had been an  exemplary employee of the Defendant.

141. Plaintiff suffered adverse employment actions based on her sex as set forth above in  that the Defendant: (1) treated female employee such as herself as sex objects; (2) stripped  Plaintiff of duties and assignments when she refused to continue to perform sexually for the  Defendant CEO Mr. Ramirez; (3) required Plaintiff as a female rape victim to disclose her  trauma to other female employees like Jenna Gaze; and (4) terminated Plaintiff in favor of  similarly situated male employees who were equally or less qualified and experienced than the  Plaintiff.

142. Plaintiff further suffered the adverse employment actions of termination and  demotion in exchange for exemplary performance as compared to her similarly situated male comparators.

143. All of the adverse employment actions set forth above took place under circumstances that give rise to an inference of sex discrimination.

144. Because Defendant, acting by and through its most senior executive, Mr. Ramirez, expressed directly to the Plaintiff that his biased view was that female employees were better to work with because Mr. Ramirez liked to sexualize them directly reveals the discriminatory

animus behind Mr. Ramirez's conduct towards Plaintiff.

145. The Defendant cannot provide a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The proffered reason for termination that the Plaintiff was

38

performing poorly is unsupportable by any facts. No disciplinary records, performance improvement plans, or counseling sessions preceded the Plaintiff's sudden pretextual termination.

146. Plaintiff can successfully demonstrate that there is no factual basis for any alleged claim of poor performance and any rationale given by Defendant for Plaintiff's termination is a mere pretext for discrimination and the clearly expressed sexual bias of Mr. Ramirez. 147. Defendant has unlawfully and willfully discriminated against the Plaintiff substantially because of her sex with regard to the terms, conditions, opportunities and privileges of her employment in violation of SC Code §1-13-80.

148. The Defendant's adverse employment actions against the Plaintiff as set forth above, occurred under circumstances giving rise to an inference of sex discrimination. 149. As a result of the Defendant's unlawful conduct as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and benefits and severe impairment to her career and future career opportunities and earnings capacity. 150. Plaintiff is entitled to compensation in accordance with South Carolina law as to this claim.

## **COUNT THREE**

## **SEXUAL HARASSMENT BASED ON QUID PRO QUO IN VIOLATION OF TITLE VII**

151. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 150 above, as though fully set forth herein.

152. Plaintiff was sexually harassed by the Defendant Apothesource acting through its senior

officers and owners Michael and Krista Ramirez when it made Plaintiff's performance of sexual

39

acts and participation in sexual disclosures and conversations a condition of her employment at

Apothesource. This was quid pro quo harassment.

153. The sexual acts required of Plaintiff in order to maintain her job at Apothesource were

demanded of her from just before the start of her employment in February of 2020 and continued

without interruption through January 2024 when she was terminated.

154. The sexual acts and disclosures which Plaintiff was required to perform to keep her job at

Apothesource included: (1) having sexual intercourse with Michael Ramirez; (2) participating in

sexual situations with Ms. Ramirez and her lovers including Adam Turner; (3) disclosing

intimate details of her sex life to Ms. Ramirez; (4) disclosing details of her sexual assaults to

Jenna Gaze for the amusement of Mr. Ramirez; and (5) listening to details of Ms. Ramirez's sex

life.

155. The sexual acts and disclosures in which Plaintiff was required to participate constitute

quid pro quo sexual harassment under Title VII. These sexual acts were requirements of

Plaintiff's continued employment at all times during her tenure with Defendant Apothesource.

156. As a result of the Defendant's unlawful quid pro quo sexual misconduct as aforesaid,

Plaintiff has sustained and will in the future sustain financial loss, including lost wages and

benefits and severe impairment to her career and future career opportunities and earnings

capacity.

157. Plaintiff is entitled to compensation for lost wages including front and back pay,

punitive damages, emotional distress damages, and attorney's fees and costs as a result of the

Defendant's discriminatory actions based on quid pro quo sex harassment. **COUNT FOUR**

**SEXUAL HARASSMENT BASED ON QUID PRO QUO IN VIOLATION OF SC CODE**

40
**§1-13-80**

158. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 157

above, as though fully set forth herein.

159. Plaintiff was sexually harassed by the Defendant Apothesource acting through its senior

officers and owners Michael and Krista Ramirez when it made Plaintiff's performance of sexual

acts and participation in sexual disclosures and conversations a condition of her employment at

Apothesource. This was quid pro quo harassment.

160. The sexual acts required of Plaintiff in order to maintain her job at Apothesource were

demanded of her from just before the start of her employment in February of 2020 and continued

without interruption through January 2024 when she was terminated.

161. The sexual acts and disclosures which Plaintiff was required to perform to keep her job at

Apothesource included: (1) having sexual intercourse with Michael Ramirez; (2) participating in

sexual situations with Ms. Ramirez and her lovers including Adam Turner; (3) disclosing

intimate details of her sex life to Ms. Ramirez; (4) disclosing details of her sexual assaults to

Jenna Gaze for the amusement of Mr. Ramirez; and (5) listening to details of Ms. Ramirez's sex

life.

162. The sexual acts and disclosures in which Plaintiff was required to participate constitute

quid pro quo sexual harassment under SC Code §1-13-80. These sexual acts were requirements

of Plaintiff's continued employment at all times during her tenure with Defendant Apothesource.

163. As a result of the Defendant's unlawful quid pro quo sexual misconduct as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and benefits and severe impairment to her career and future career opportunities and earnings capacity.

41

164. Plaintiff is entitled to compensation in accordance with South Carolina law as to this claim.

## COUNT FIVE

## HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII

165. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 164 above, as though fully set forth herein.

166. Due to the unwanted sex demands, forced sexual intercourse with Michael Ramirez and Adam Turner as part of her work duties, sexually charged jokes, forced disclosures of sexual details, sexual innuendo, and explicitly forced disclosure of details of the sexual assaults Plaintiff experienced at Apothesource to Jenna Gaze, the Defendant Apothesource created a workplace that was so permeated with sexual intimidation that was sufficiently severe and pervasive that it altered the conditions of the Plaintiff's employment, created an abusive hostile environment based on sex, and interfered with Plaintiff's ability to do her job.

167. In fact, to the extent that Defendants allege that Plaintiff performed poorly at work following the coerced sex by Michael Ramirez and the sexual assaults by Adam Turner, these allegations provide strong evidence that Plaintiff was impaired in her performance due to the constant sexualization and forced sexual encounters and forced sexual disclosures she experienced at Apothesource.

168. The sexually hostile conduct included direct statements from Mr. Ramirez and Ms.

Ramirez that the Plaintiff should engage in explicit sexual acts with Mr. Ramirez, Mr. Turner, other lovers mentioned by Ms. Ramirez, and that the Plaintiff had to discuss her sexual assault trauma with Jenna Gaze to keep her job.

42

169. There is a specific basis to impute the conduct by Mr. Ramirez, Jenna Gaze, and Ms. Ramirez that created the sexually hostile environment for the Plaintiff to the Defendant Apothesource.

170. The Defendant Apothesource did not take reasonable steps to establish and promulgate anti-sex harassment and discrimination policies and reporting procedures and therefore failed to provide and corrective or preventative policies and procedures to protect targets of harassment such as the Plaintiff. This was particularly impactful on employees who were being harassed by the Defendant corporation's owners.

171. The sexually hostile environment described above to which the Plaintiff was subjected occurred from before the start of her employment in February 2020 and continued without interruption through the date of her termination in January 2024. The sexually hostile environment described above was part of a continuing course of conduct which occurred throughout the Plaintiff's employment at Apothesource.

172. Mr. Ramirez and Ms. Ramirez were not only Plaintiff's supervisors but also high-ranking executive officers and owners in Defendant Apothesource's organization. All of the actions committed by Mr. Ramirez and Ms. Ramirez are attributable to Apothesource as they were its agents, servant, and employee at all times described hereinabove while acting within the scope of their employment. Defendant is directly liable for the damages caused to the Plaintiff by its

owners in the course of managing the Plaintiff.

173. The pervasive unwanted sexual demands, obscene invitations, forced disclosures, and sexual comments which created the sexually hostile work environment for the Plaintiff and which is attributable to Defendant was a violation of Title VII.

43

174. The sexually hostile work environment that changed the Plaintiff's working conditions caused the Plaintiff to suffer severe emotional distress and mental anguish for which she has sought and is likely to continue to require medical treatment.

175. As a result of the Defendant's unlawful sexually hostile environment as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and benefits and severe impairment to her career and future career opportunities and earnings capacity.

## COUNT SIX

## HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF SC CODE §1-13-80

176. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 175 above, as though fully set forth herein.

177. Due to the unwanted sex demands, forced sexual intercourse with Michael Ramirez and Adam Turner as part of her work duties, sexually charged jokes, forced disclosures of sexual details, sexual innuendo, and explicitly forced disclosure of details of the sexual assaults Plaintiff was required to make to Jenna Gaze, the Defendant Apothesource created a workplace that was so permeated with sexual intimidation that was sufficiently severe and pervasive that it altered

the conditions of the Plaintiff's employment, created an abusive hostile work environment based on sex, and interfered with Plaintiff's ability to do her job.

178. In fact, to the extent that Defendants allege that Plaintiff performed poorly at work following the coerced sex by Michael Ramirez and the sexual assaults by Adam Turner, these allegations provide strong evidence that Plaintiff was impaired in her performance due to the

44

constant sexualization and forced sexual encounters and forced sexual disclosures she experienced at Apothesource.

179. The conduct included direct statements from Mr. Ramirez and Ms. Ramirez that the Plaintiff should engage in explicit sexual acts with Mr. Ramirez, Mr. Turner, other lovers mentioned by Ms. Ramirez, and that the Plaintiff had to discuss her sexual assault trauma with Jenna Gaze to keep her job.

180. There is a specific basis to impute the conduct by Mr. Ramirez, Jenna Gaze, and Ms. Ramirez that created the sexually hostile environment for the Plaintiff to the Defendant Apothesource.

181. The Defendant Apothesource did not take reasonable steps to establish and promulgate anti-sex harassment and discrimination policies and reporting procedures and therefore failed to provide and corrective or preventative policies and procedures to protect targets of harassment such as the Plaintiff. This was particularly impactful on employees who were being harassed by the Defendant corporations owners.

182. The sexually hostile environment describe above to which the Plaintiff was subjected occurred from before the start of her employment in February 2020 and continued without

interruption through the date of her termination in January 2024. The sexually hostile environment described above was part of a continuing course of conduct which occurred throughout the Plaintiff's employment at Apothesource.

183. Mr. Ramirez and Ms. Ramirez were not only Plaintiff's supervisors but also high-ranking executive officers and owners in Defendant Apothesource's organization. All of the actions committed by Mr. Ramirez, Jenna Gaze, and Ms. Ramirez are attributable to Apothesource as they were its agents, servant, and employee at all times described hereinabove while acting

45

within the scope of their employment. Defendant is directly liable for the damages caused to the Plaintiff by its owners in the course of managing the Plaintiff.

184. The pervasive unwanted sexual demands, obscene invitations, forced disclosures, and sexual comments which created the sexually hostile work environment for the Plaintiff and which is attributable to Defendant was a violation of SC Code §1-13-80.

185. The sexually hostile work environment that changed the Plaintiff's working conditions caused the Plaintiff to suffer severe emotional distress and mental anguish for which she has sought and is likely to continue to require medical treatment.

186. As a result of the Defendant's unlawful sexually hostile environment as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and benefits and severe impairment to her career and future career opportunities and earnings capacity.

187. Plaintiff is entitled to compensation in accordance with South Carolina law as to this claim.

## COUNT SEVEN

## DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE ADA

188. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 187 above, as though fully set forth herein.

189. The Plaintiff was discriminated against in the terms, privileges, and conditions of her employment by the Defendant Apothesource in that she was treated differently than other non disabled employees based in part on her mental health disabilities.

190. The Plaintiff is a person with a disability under the ADA in that she has a record of disability and in that she suffers from one or more conditions that interfere in the performance of

46

one or more of her major activities of daily living. Further, the Plaintiff was regarded as disabled by the Defendant, Apothesource due to the PTSD resulting from the sexual trauma Plaintiff experienced during her employment at Apothesource.

191. The Plaintiff was highly qualified for the position she held with the Defendant, she was able to perform all of her duties with or without reasonable accommodation, and she was performing her duties well.

192. The Defendant employer was subject to the ADA.

193. The plaintiff suffered adverse employment actions as set forth above including without limitation, demotion and termination based on her disabilities.

194. The timing of the adverse employment actions and the circumstances of said adverse actions as described above give rise to an inference of disability discrimination. Defendant employee Jenna Gaze was required to monitor Plaintiff's mental state and forced her to disclose circumstances and symptoms of her PTSD on a regular basis.

195. The adverse employment actions taken against the Plaintiff by the Defendant were

motivated at least in part by discriminatory animus regarding Plaintiff's disabilities.  196.

Defendant Apothesource cannot and has not offered a legitimate non-discriminatory  reason for

the adverse actions taken against the Plaintiff, including terminating the Plaintiff. The  Plaintiff

was a high-performing employee and the reasons proffered in explanation by Defendant  for the

Plaintiff's termination are merely pretext for the unlawful discrimination under the ADA. 197.

The Plaintiff has suffered significant losses and damages as a result of the Defendant's  unlawful

discrimination under the ADA.

198. The Plaintiff has suffered significant and severe emotional distress due to the aforesaid

violations of the ADA by the Defendant.

47

199. The Plaintiff has suffered lost wages and loss of earning capacity as a result of the

aforesaid violations of the ADA by the Defendant.

## COUNT EIGHT

## INTENTIONAL INFLCITION OF EMOTIONAL DISTRESS AS AGAINST APOTHESOURCE

200. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 199

above, as though fully set forth herein.

201. Defendant, acting by and through its senior management officer Mr. Ramirez, knew or

should have known that severe emotional distress was a likely outcome of its outrageous sexual

exploitation of the Plaintiff as described more fully hereinabove.

202. Defendant's intentional outrageous sexual exploitation resulted in Plaintiff's wrongful

and unlawful termination which was conducted in such a duplicitous and abusive manner that

severe emotional distress was inflicted upon the Plaintiff up to and including the time of her

termination.

203. Defendant's conduct as set forth above caused the Plaintiff severe emotional distress which was likely to and did in fact cause the Plaintiff harm.

204. Defendant's persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

205. The emotional distress inflicted on the Plaintiff by the Defendant has caused the Plaintiff to suffer losses and damages including severe emotional distress damages, lost wages and lost earning capacity.

48
## COUNT NINE

## INTENTIONAL INFLCITION OF EMOTIONAL DISTRESS AS AGAINST MR. RAMIREZ IN HIS INDIVIDUAL CAPACITY

206. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 205 above, as though fully set forth herein.

207. Defendant Mr. Ramirez, knew or should have known that severe emotional distress was a likely outcome of his outrageous sexual exploitation of the Plaintiff as described more fully hereinabove.

208. Defendant's intentional outrageous sexual exploitation resulted in Plaintiff's wrongful and unlawful termination which was conducted in such a duplicitous and abusive manner that severe emotional distress was inflicted upon the Plaintiff up to and including the time of her termination.

209. Defendant's conduct as set forth above caused the Plaintiff severe emotional distress which was likely to and did in fact cause the Plaintiff harm.

210. Defendant's persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

211. The emotional distress inflicted on the Plaintiff by the Defendant has caused the Plaintiff to suffer losses and damages including severe emotional distress damages, lost wages and lost earning capacity.

## COUNT TEN

## INTENTIONAL INFLCITION OF EMOTIONAL DISTRESS AS AGAINST MS. RAMIREZ IN HER INDIVIDUAL CAPACITY

49

212. Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 237 above, as though fully set forth herein.

213. Defendant Ms. Ramirez, knew or should have known that severe emotional distress was a likely outcome of her outrageous sexual exploitation of the Plaintiff as described more fully hereinabove.

214. Defendant's intentional outrageous sexual exploitation resulted in Plaintiff's wrongful and unlawful termination which was conducted in such a duplicitous and abusive manner that severe emotional distress was inflicted upon the Plaintiff up to and including the time of her termination.

215. Defendant's conduct as set forth above caused the Plaintiff severe emotional distress which was likely to and did in fact cause the Plaintiff harm.

216. Defendant's persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

217. The emotional distress inflicted on the Plaintiff by the Defendant has caused the Plaintiff to suffer losses and damages including severe emotional distress damages, lost wages and lost earning capacity.

## V. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff hereby requests the following relief:

A. Award of compensatory money damages for lost benefits, wages, and earnings;  B. Award of punitive damages for wanton and reckless conduct;

C. Award attorneys' fees and costs pursuant to state and federal statutes herein;  D. Award pre-judgement interest;

50

E. Award post-judgement interest;

F. Award of compensatory money damages for severe and egregious emotional

distress; and

G. Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Respectfully Submitted,

ALISHA ARDIS,
PLAINTIFF

744 moonsail Cirl. By:/s/ Alisha Ardis

Chapin, SC     Alisha Ardis

29036     Pro Se Plaintiff

744 Moonsail Circle
Chapin, South Carolina 29036
alisha.ardis@gmail.com

51

# EXHIBIT A